

# Law Offices of John C. Conard

7582 Currell Blvd., Suite 212 ■ Woodbury, Minnesota 55125 ■ Phone: 651.797.0950 ■ Fax 651.204.2127

September 8, 2013

Honorable Thomas P. Griesa
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: Luba Kramrish
Court File No.: S1 11 CR 120 TPG

Dear Honorable Judge Griesa:

    I write with regard to the above captioned matter and to respectfully submit Ms. Kramrish's sentencing position in advance of the sentencing hearing now scheduled to take place before your honor. Ms. Kramrish was convicted of Mail Fraud and Conspiracy to Commit Mail Fraud following a jury trial.

    I respectfully submit that a probationary sentence would be an appropriate but not excessive sentence, given the facts adduced at trial, the particular nature of Ms. Kramrish's involvement, and the considerations set forth in 18 U.S.C. § 3553(a). In summary, Ms. Kramrish was a minor participant, submitted valid applications, dealt solely with actual holocaust survivors, was herself victimized by the architects of the scheme, and has led an otherwise exemplary life.

## I. Ongoing Objections

Ms. Kramrish continues to object to the loss causation rationale proposed by the Government. First, to the extent that the Government seeks to use a statistical average to calculate a loss amount for each incorrectly paid file, such an approach is inappropriate because the Government has access to the actual loss, in United States dollars for any file that can be linked to Luba Kramrish. Second, to the extent that the government credits the claim that Ms. Kramrish submitted 20-25 false applications, such is simply not supported by the evidence. The proposed number of applications itself is simply a guess by Faina Davidson, whose spectacular dissociation with the truth was on ample display throughout the trial. For example, Davidson testified that Luba's mother submitted a birth certificate from 1944, which needed to be replaced by a forged document, and that the case was worked by Inna Krylyak. (Tr. 1432-1446). Both assertions were proven to be false by documentary evidence (Ex. Kramrish 1, 2, and 3). Faina Davidson also destroyed any records of these applicants that could shed light on the matter.

Moreover, even if Kramrish were involved with 20-25 files, it does not follow from the evidence that she was involved with 25 *fraudulent* files because it was established that at least the first two files that Kramrish touched were legitimate applicants (her mother's file and the very next file submitted (Tr. 1444-1446)). It was further established that every single applicant who dealt with Kramrish was alive during the war, and located in an area that was at some point occupied. The factual record simply does not support the shorthand calculation proposed by the government to extend the loss calculation beyond the files for which it has been established that the applicants were ineligible, that Kramrish dealt with the file, and that fraudulent documents were furnished. Looking solely at the files produced at trial, that amount is $200,508.86. The other supplemental files the Government offers now include evidence that this Court excluded upon objection, and files for which there is no foundational support.

Consequently, the loss causation should add 12 points and not 14 to the Guidelines calculation. This would result in a specific offense score of 19, not 21.

Ms. Kramrish further objects to the claim, unsupported by the record that she was paid between $500 and $1,500 per file for her efforts. Ms. Kramrish kept only $500 per file for her services, roughly the same amount that was paid to the URO to mishandle her mother's file (Ex. Kramrish 1, 2, and 3).

## II. Kramrish's Written Allocution

Your Honor, when I was 13 years old I had surgery on my back and was bed ridden for one year. My mother Minta Stoliar was by my side the whole time. She is now 93 years old and suffers from Alzheimer's disease and is bed ridden herself. She is a holocaust survivor and deservedly receives a pension from the claims conference to this date. I spend hours every day, sometimes twice a day, at her side helping to feed and take care of her. The nursing home she is in cannot offer one to one attention and residents can be left dirty and hungry by the time they get some attention. When she is sick there cannot always be staff around her that can take care of her like I do. Please, your honour, don't let me live with the guilt of not being able to be by her side if God forbid something happens.

The horrors of the holocaust are difficult to think about and I can't even imagine how people made it through the suffering and pain, but they did. These people deserve some kind of restitution for that and I legitimately thought I was helping them get it. The situation I am in today still does not make sense to me. I understand that I am expected to have known about the fraud, but if I had known I would never have been part of it.

My husband has a university degree and is an electrical engineer by trade until we moved to Canada. He is 66 years old and still driving a tractor trailer to this day to provide for our family. He usually starts work before the sun rises and very often is not home until it is back down again. My 2 sons have been working since the age of 14 and

have or are working towards professional designations. The Kramrish family does not live a lavish lifestyle as you might expect of someone convicted of white collar crime. We still live in the same 3 bedroom town house that we purchased in 1995.

The last 2 years have been similar to incarceration for me. I didn't want to see or talk to anyone because of shame and embarrassment and rarely left home other than to see my mother and other relatives. My family is all I ever had in this world and I need to be with them. If I knew what kind of situation the applicants who I helped would be in today, I would have never helped them when they approached me. I have never had any intention of stealing anything from anyone. I ask, your Honor, that you consider my situation when dealing my sentence. Thank you.

### III. A Guideline Sentence is excessive and disproportionate.

The guidelines range based on the Government's calculation is 37-46 months of imprisonment. Even using a more accurate loss amount as proposed by defense would place the specific offense score at 19 and call for a 30-37 month period of incarceration. Both are grossly disproportionate to the sentences imposed for central actors within this scheme, and are excessive with respect to Luba Kramrish.

The Guidelines are too focused on the mathematical calculation of loss. As an example, accepting the Government's view that the average Article 2 applicant received roughly $39,000, the submission of a single unjustified application would add 6 points to one's specific offense score. Abusing a position of trust only adds 2 points, victimizing 50 or more people only adds 4 points. This approach creates a mis-match between moral culpability and sentencing. Such a mathematical approach has been widely criticized. *U.S. v. Emmenegger,* 329 F. Supp.2d 416 (S.D.N.Y. 2004), *U.S. v. Gupta,* No. 11 Cr. 907 (JSR), 2012 WL 5246919 (S.D.N.Y. Oct. 24, 2012).

The guidelines with respect to Luba Kramirsh expand her liability from a basic 0-6 month recommendation to a significant prison commitment based *solely* on the amount of loss that the government suggests can be attributed to Ms. Kramrish. One example serves

to illustrate the absurdity of this calculation: Dora Grande, who ran the "document mill" that enabled the entire $57 Million dollar fraud was sentenced to 21 months, and "Tina Rome", who ran a multimillion dollar applicant recruiting scheme from a law office was sentenced to 24 months. The government urges this court to give Luba Kramrish a sentence that is 176%, or 154% of those sentences respectively.

Focusing on loss alone would encourage this Court to sentence a principle architect of the fraud to half the time of an individual who is a rounding error within the scheme. Certainly justice is well served by looking to other factors.

### IV. The seriousness of the offense, respect for the law, and just punishment.

There is no doubt that the conspiracy at work in this matter was revealed to be far reaching and very serious. Within this conspiracy, some submitted claims for holocaust reparations from 12 year-old children. Some actively recruited applicants with advertisements, and operated from within Law Firms, or within the claims conference itself. Such behavior makes a mockery of the suffering of true survivors and jeopardizes justice for all. Insiders, who were in a position of trust and authority to help disburse funds designed and carried out a shocking scheme of theft. These individuals were able to line their pockets solely because of the special knowledge, and trust they had as claims conference insiders.

Luba Kramrish became involved when she made a phone call to check the status of her mother's application. As fate would have it, Faina Davidson picked up the phone and extracted $2,000 from Luba Kramrish. We learned during the trial, that by happenstance, the necessary Vinnitsa document arrived independantly, and Davidson did not need to do anything (Tr. 1460-1461). But, from Luba's end of the phone, she had paid $2,000 for research, and the application was approved. In her small community word got out, and a year later someone else asked for help. We know from testimony that applicant was legitimate and eligible. She submitted applications for individuals who were alive during the war, and who lived in areas believed to be affected by the Nazi

onslaught. The unanimous testimony was that every story she submitted was accurate and that every document she submitted was accurate. Moreover, it is firmly established that Luba Kramrish was in the dark about the "document mill" which was the lifeblood of the scheme.

Luba Kramrish should have undertaken to uncover what was really happening, and the "willful blindness" standard makes her conduct criminal. However, such conduct is certainly less deserving of punishment than a cold and calculated plot to steal. Such conduct is less serious and less an affront to the notion that we must all respect the law, than a plot to shatter the law.

Finally, throughout the duration of this matter Ms. Kramrish waived her substantial rights to fight extradition, submitted herself to the jurisdiction of this Court, and has faithfully maintained contact with pretrial supervision agents. She has displayed diligent respect for the law throughout these proceedings. While she has made mistakes, she is hardly an outlaw.

### V. Adequate deterrence of criminal conduct.

Crime should be punished, and swift punishment has certain deterrent effect. Deterrence requires proportionality as well. The truly culpable should be punished more harshly than the less culpable to deter criminal behavior in both kind and degree. In cases like this deterrence is best served when the Court considers the nature of involvement, personal gain, level of planning and authority within the scheme, and the motivation of a given participant.

Luba Kramrish took a pittance of a fee for her activities. While she is labeled a "recruiter" the evidence is that she was solicited by applicants. Luba Kramrish did not advertise or seek participants, they sought her. She neither designed, nor expanded the scheme. Luba Kramrish appears to be the only "recruiter" who submitted applications for legitimate, eligible survivors and who submitted only plausible applications. The evidence is that she was ignorant of huge swaths of the scheme.

By all accounts Luba Kramrish is a tiny participant, and as such deterrence is served by a probationary sentence.

### VI. Protecting the public from further criminal conduct by Luba Kramrish

As the Court noted in response to the government's application to revoke bail, while Ms. Kramrish has been convicted of criminal behavior, she is simply not an outlaw. Outside of this case she has struggled to raise a family, and overcome the significant difficulties that she has faced. There is no trace of additional criminal behavior in her life, and no reason to believe that she poses a threat to the public. Certainly any minor threat she poses is adequately addressed by probation.

### VII. A Guideline Sentence would Disproportionately Punish Luba Kramirsh.

The Government cites to *United States v. Bedoya-Cano*, for the proposition that the Court should seek to avoid national disparities in sentencing, while allowing marked disparities within a given conspiracy. (U.S. Sent. Mem. at 16). A quick read of the case shows this to be ridiculous, because the B*edoya-Cano* Court specifically evaluated the defendant *qua* his co-defendants and found that they were not similarly situated. *U.S. v. Bedoya-Cano,* 186 F. App'x 56, 58-9 (2d Cir 2006). The 2nd Circuit followed exactly the same approach in *U.S. v. Nouri*, 711 F.3d 129, 146 (2d Cir. 2013).

The government is tacitly urging this court to sentence Luba Kramrish half-again as harshly as central mater minds like Dora Grande or "Tina Rome", where the only aggravating factor is that Luba Kramrish exercised her right to a trial. Kramrish had no cooperation to trade, because she was of no importance to the scheme; it seems strangely perverse that the more culpable actors can buy mercy because the fact of their cravenness put them in a position to be a turncoat. Similarly situated defendants have been sentenced to far less than the guidelines range. Finally, it is worth noting that "acceptance of responsibility" only buys a discount of two points. Such a bargain would

only *lower* Luba Kramrish's sentence by approximately 7 months. The government urges this Court to quadruple that amount simply in the other direction.

In conclusion I respectfully submit that a guidelines sentence is excessive, while a sentence including significant supervision is adequate, but not excessive to ensure the goals of a proper sentence.

Sincerely,

John C. Conard
Attorney at Law

cc:   Christopher Frey, Assistant U.S. Attorney